47 CCPA

**Application of Jan ROSICKY.**
**Patent Appeal No. 6513.**

United States Court of Customs
and Patent Appeals.
March 30, 1960.

Harry C. Bierman, New York City
(Hugo E. Weisberger, Washington, D. C.,
of counsel), for appellant.

Clarence W. Moore, Arthur H. Behrens, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for
the Commissioner of Patents.

Before WORLEY, Chief Judge, and
RICH, MARTIN, and SMITH, Associate
Judges, and Judge C. WILLIAM
KRAFT.[1]

MARTIN, Judge.

This appeal is from a decision of the
Patent Office Board of Appeals affirming
the final rejection of claims 1, 5, 11 to 15,
17, 18 and 28 to 36 in application Serial
No. 402,590 filed January 6, 1954, entitled "Xanthene Derivatives and Process
of Making Same." Several claims directed to more limited processes have
been allowed.

The following claims are considered to
be representative:

"1. In a process of producing
xanthene derivatives having a basic
side chain in 9-position, the steps
comprising contacting xanthene in a
non-polar organic solvent with a sodium-transferring agent in statu nascendi and adding to the resulting
xanthene sodium a halogen substituted organic base.

[1]. United States District Judge for the
Eastern District of Pennsylvania, designated to participate *in place of Judge*
*O'Connell,* pursuant to provisions of Section 292(d), Title 28, United States Code.

"28. A xanthene compound having a basic side chain in 9-position, said compound being selected from the group consisting of a xanthene compound of the formula

wherein Z is a heterocyclic ring selected from the group consisting of the piperidine ring and the pyrrolidine ring, said heterocyclic ring being connected to the $CH_2$-group by its nitrogen atom, its acid addition salts, and its quaternary ammonium compounds with lower alkyl halides and lower alkyl sulfates.

"31. A spasmolytic and antihistaminic composition comprising, as essential spasmolytic and antihistaminic ingredient, not less than 0.1% of a xanthene compound having a basic side chain in 9-position, said compound being selected from the group consisting of a xanthene compound of the formula

wherein Z is a heterocyclic ring selected from the group consisting of the piperidine ring and the pyrrolidine ring, said heterocyclic ring being connected to the $CH_2$-group by its nitrogen atom, its acid addition salts, and its quaternary ammonium compounds with lower alkyl halides and lower alkyl sulfates, and a significant amount of a pharmaceutical carrier."

The process of making the claimed substituted 9-xanthenes includes producing the intermediate sodium xanthene. The examples require as a first step the thorough mixture of finely divided sodium in an inert nonpolar solvent such as anisole. To the resulting suspension xanthene is added, after which chloro-, iodo-, or bromobenzene is introduced slowly, while stirring constantly. Thereafter a basic alkyl halogenide, such as B-pyrrolidino ethyl chloride, is added with stirring. Upon crystallization and separation the corresponding substituted 9-xanthenes are obtained. By familiar processes, the substituted 9-xanthenes may be quaternized or treated to form the corresponding acid addition salts.

The claimed compounds and compositions are sufficiently exemplified by claims 28 and 31. They are said to combine a highly desirable combination of spasmolytic (prevents or retards spasms) and antihistaminic (alleviates allergic symptoms) properties.

The only reference in the record is Cusic et al., U. S. Patent No. 2,676,971, issued April 27, 1954, filed April 21, 1951. The Cusic et al. specification includes the following:

"The compounds which constitute our invention are represented by the structural formula

wherein X represents *oxygen* or sulfur, *alk is a lower bivalent saturated aliphatic hydrocarbon radical*, R, R' and R" are members of the class consisting of alkyl, aralkyl, alkenyl and hydroxyalkyl radicals and Z is one equivalent of an anion. The radical alk represents a bivalent saturated hydrocarbon radical of from two to eight carbon atoms. The radicals

are derived from straight-chain or branched-chain aliphatic hydrocarbons and include such radicals as ethylene, propylene, butylene, amylene, hexylene, and polymethylenes from trimethylene to octamethylene. Among the radicals which R, R', and R" represent are such lower alkyl groups as methyl, ethyl, propyl, butyl, amyl and hexyl, hydroxyethyl, hydroxypropyl, hydroxybutyl, hydroxyamyl, hydroxythexyl, wherein the propyl, butyl, amyl, and hexyl groups may be either of the straight-chain or branched-chain type. Further, these radicals may be of unsaturated type as in the case of allyl, crotyl, methallyl, other butenyls, pentenyls and the like.

"*The radical NRR' may also be a nitrogen-containing hetermono-cyclic radical such as piperidine,* lupetidine, *pyrrolidine,* morpholine, thiamorpholine, piperazine, N'-alkylpiperazine and the like. The radical Z represents one equivalent of an anion such as fluoride, bromide, chloride, iodide, sulfate, phosphate, citrate, oxalate, benzenesulfonate, ascorbate and sulfamate." (Emphasis ours.)

With respect to the therapeutic properties of the compounds, the patent states that the quaternary salts are active cardio-vascular agents and that they "are active in preventing the transmission of sympathetic and parasympathetic autonomic nerve impulses through the ganglia" (at least one of the effects of spasmolytic agents).

To make the Cusic et al. compounds, the 9 position of xanthene is activated. The patent teaches for this purpose the use of an ether solution of n-butyl lithium, or a toluene solution of lithium amide or sodamide. Those solutions with xanthene and chloro-dialkylamines present form 9-(dialkylamino alkyl) xanthenes.

The board held process claims 1, 5 and 11 to 15 to be unpatentable over Cusic et al. It was not felt that "sodium-transferring agent" excluded sodamide (sodium amide) even when considered in conjunction with "in statu nascendi," which phrase was said by the board to be "indefinite and meaningless." Nothing was found in the specification which limited the transferring agent to chloro-, bromo- or iodobenzene.

Appellant asserts that the phrase "in statu nascendi" requires the sodium to be present in its nascent or transitory highly active state, rather than as a preformed compound such as sodamide. In such a condition, it is said, the sodium reacts with xanthene to form xanthene sodium much more rapidly than does sodamide. It is this which appellant relies upon to distinguish his process from that taught by Cusic et al., none of the other features being argued to be patentably different from the cited art.

Claim 1, the broadest process claim, will be considered first. The portion of the claim which is in controversy reads:

" * * * the steps comprising contacting xanthene in a non-polar organic solvent with *a sodium-transferring agent in statu nascendi * * *"* (Emphasis ours.)

Hachk's Chemical Dictionary, 3rd Ed., 1950, states the following:

"Status Nascendi. The nascent (q.v.) state, or the condition of a molecule at its formation during a chemical reaction. Many elements are more active when newly-formed (as hydrogen), and it is assumed that in this state there exist free atoms, H, that have not combined into the molecule, $H_2$.

"Nascent. Describing a chemical substance at the moment of its formation; especially a gas at the moment it is generated in which condition it is more chemically-active, presumably on account of free single *atoms* being present, instead of the less active gas *molecules.* n. state. The condition of a substance during its formation, or liberation from its compounds (see *status nascendi*)."

Those definitions make it clear to us that the phrase has a definite meaning, that it connotes to chemists a highly active

state in which an element can exist. While we recognize that the term "nascent state" is more commonly applied to substances such as oxygen, hydrogen, chlorine and nitrogen, there is nothing which has been brought to our attention which would indicate that it is inapplicable to elemental sodium.

It now becomes necessary to consider the manner in which the phrase "in statu nascendi" modifies "sodium-transferring agent" to see if it excludes substances such as sodamide, a preformed sodium transferring carrier.

It is clear from appellant's specification that the term "sodium-transferring agent" requires the presence of both sodium and the transferring means. In view of the meaning of "in statu nascendi" we feel that it, in conjunction with "sodium-transferring agent," limits the transferring agent to one which is capable of providing highly active sodium, and requires the presence of nascent or transitory sodium. Appellant has given three examples of such carriers, chloro-, bromo- and iodo-benzene, which function in that manner, and it is to these compounds that appellant refers as being suitable media for producing nascent sodium.

All of the Cusic et al. sodium transferring agents, such as sodamide, are *preformed,* and do not, so far as the record shows, produce nascent sodium which appellant alleges tends to react with xanthene much more rapidly than the preformed compounds. The basis of the board's rejection of claim 1 was that it was directly anticipated by Cusic et al., and that it lacked the essential element of novelty. Since we find that the process is novel over the cited prior art, we are left with the question of obviousness.

There is nothing of record either by way of references or statements of the Board of Appeals or examiner which assists us in ascertaining whether the use of a transferring agent capable of producing nascent sodium in a process for making xanthene sodium would have been obvious to one of ordinary skill in the art at the time this application was filed. We have no authority to presume that it would have been obvious and we will not do so; consequently we must hold it to be unobvious. The board's rejection of claim 1, as well as claims 5 and 11 to 15 which are all of narrower scope, over the art of record is reversed.

It is not necessary to consider all of the board's reasons for rejecting compound claims 17, 18, 28, 29 and 30 since we find one of their reasons to be correct. The board stated that "Since the particular groups [piperidine and pyrrolidine] are disclosed in the [Cusic et al.] reference as the equivalent of other amino radicals and are so considered generally in the medicinal art, as well as in their preparation, and would be so recognized by one skilled in the art, there is no need for a specific exemplification thereof to be anticipatory."

Appellant relies upon two basic arguments,[1] the first of which is that Cusic et al. does not specifically name the claimed compounds nor teach how or that they may be made.

It is true that all of the products specifically named by Cusic et al. are dialkylamines and that those claimed by appellant are not named. It is clear beyond doubt, however, that the compounds claimed are within the scope of the generic disclosure of the reference. The specification of the patent describes not only the compounds specifically named therein, but also those in which either

---

[1] In addition, appellant asks us to make a distinction between

(1) a disclosure made in knowledge of published prior art which an inventor presumably should know and can know, and

(2) a disclosure made whereby the inventor was unable to know the prior art

because it was not published at the time his application was filed but was merely and in secret disclosed to the Patent Office in a pending application.

Since 35 U.S.C. § 102(e) states that a United States patent is effective as a reference as of its filing date, appellant's contention is devoid of persuasive force.

a piperidine or a pyrrolidine heterocyclic ring is utilized in lieu of a dialkylamine. Therefore the fact that appellant's specific compounds are not named is of no moment. Further there is no reason of record to believe that they could not be made in the same manner as the dialkylamines exemplified. It is unnecessary for us to pass upon the question of whether the two groups are generally known as equivalents in the medicinal arts. However, the recent decision of this court, In re Grimme, 274 F.2d 949, 47 CCPA ——, is interesting to note in that regard. Claims 17, 18, 28, 29 and 30 are unpatentable, and the board's rejection of those claims is affirmed.

■ In our consideration of the patentability of the compound claims in this case, we have not been persuaded by appellant's second contention that his compounds embody an eminently advantageous combination of spasmolytic and antihistaminic activities. First of all, Cusic et al. points out that the genus therein disclosed has antispasmodic properties. While no suggestion is made of potential antihistaminic value, it is clear that such properties are inherent in at least some of the compounds specifically named by Cusic et al.[2] Where, as here, appellant is merely claiming the *compounds* themselves and at least one of the properties upon which he relies to predicate patentability is disclosed as possessed by the prior art, we find no good reason to remove from the realm of that which is anticipated, those compounds which have some additional property not so disclosed.

The board was of the opinion that the recitation of a pharmaceutical carrier, in combination with the compounds discussed above, did not render claims 31 to 36 patentable over the Cusic et al. patent. Appellant, to overcome this ground of rejection, relies primarily upon a number of prior art patents which include claims to compounds in the environment of carriers of various types, presumably to establish that the utilization of a carrier in admixture with a compound can make an old compound patentable. We know of no authority which compels such a conclusion. Accordingly we will confine our attention to the record.

■ Although the Cusic et al. patent does not refer to carriers, the specification does state that the compounds are useful pharmacological and therapeutic agents. It is well known, and it needs no citation of authority, that drugs and pharmaceuticals are usually dispensed and utilized in either liquid or solid media. One skilled in the arts concerned with agents of the type disclosed by Cusic et al. would be cognizant of the fact that the therapeutics of the reference would have to be diluted or suspended in some manner to make them pharmaceutically useful. Consequently, it would be obvious to one skilled in the art to utilize a carrier with the disclosed compounds of Cusic et al., and appellant having done no more than the obvious in this respect cannot rely upon such a feature for patentability.

■ Appellant has further pointed out that several of his claims require certain quantities of the pharmaceutical agents to be in the carriers, for example, between about 25 and 125 mg. (claim 36). Appellant has not established by any sort of clinical data that such a quantity would be a safe or useful dosage for the treatment of any particular malady, or useful for the alleviation of specific symptoms. The board's rejection of composition claims 31 to 36 is affirmed.

The rejection of claims 17, 18 and 28 to 36 inclusive is affirmed; the rejection of claims 1, 5 and 11 to 15 is reversed.

Modified.

---

2. Interestingly enough, appellant's disclosure attributes this allegedly surprising combination of properties not only to the piperidine and pyrrolidine substituted 9-xanthenes but also to at least one of the dialkylamino substituted 9-xanthenes specifically named by Cusic et al.