50 CCPA

**Application of Ernst-Albrecht PIEROH and Horst Werres.**

**Patent Appeal No. 6972.**

United States Court of Customs and Patent Appeals.

June 28, 1963.

Klein & Padlon, New York City (Joseph F. Padlon, New York City, and H. E. Weisberger, Washington, D. C., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (J. E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

This is an appeal from a decision of the Board of Appeals affirming the examiner's rejection of claims 1–9 of appellants' application [1] entitled "Soil Disinfectants and Method of Applying Same". No claims have been allowed.

Appellants have requested that claim 10 submitted in a proposed amendment filed July 21, 1958 be considered by the court "pro hac vice." The proposed amendment, which is not in the record, was refused admission by the examiner, was not considered by the board, and therefore, according to our established practice will not be considered here. In re Wiedman, 243 F.2d 798, 44 CCPA 901.

The appealed claims relate to a method of and composition for controlling soil-dwelling nematodes by impregnating nematode infested soil with a "parasiticidal" amount of methyl isothiocyanate (methyl mustard oil) in a suitable liquid carrier.

Rejected claims 1–5, inclusive, are specific to a method for controlling soil dwelling nematodes while claims 6–9, inclusive, are specific to a composition for controlling such nematodes which comprises methyl isothiocyanate in an organic solvent.

Claims 1 and 6 are representative and read:

"1. A method of controlling soil dwelling nematodes which comprises impregnating nematode infested soil

[1] Serial No. 691,793 filed October 23, 1957.

with a parasiticidal amount of methyl isothiocyanate.

"6. A composition for controlling soil dwelling nematodes which comprises methyl isothiocyanate in solution in an organic solvent."

The following references are relied on by the examiner and the board: [2]

| | | |
|---|---|---|
| Payne | 2,377,446 | June 5, 1945 |
| Hammer | 2,419,073 | April 15, 1947 |
| Kagy et al. | 2,448,265 | August 31, 1948 |
| Bickerton | 2,473,984 | June 21, 1949 |
| Carter | 2,502,244 | March 28, 1950 |
| Kay | 2,543,580 | February 27, 1951 |
| Hilmer | 2,695,859 | November 30, 1954 |
| Stansbury et al. | 2,701,224 | February 1, 1955 |
| Hardy | 2,769,745 | November 6, 1956 |
| Wolf | 2,779,680 | January 29, 1957 |
| Barrons | 2,794,727 | June 4, 1957 |
| Heininger | 2,809,983 | October 15, 1957 |

Cupples – Jour. Eco. Int., June 1936, Vol. 29, No. 3, pp. 611–618 (pg. 617 relied on)

Frear – A Catalogue of Insecticides and Fungicides (1948) Vol. I., pg. 76 Chronica Botanica Co.

———◆———

All the appealed claims were rejected under 35 U.S.C. 103 as "obvious from the Cupples and Frear publications and the supporting patents cited."

The Cupples article describes toxicity tests on an insect called California red scale. These tests were conducted with over 300 chemical compounds in an effort to find *fumigants* better than hydrocyanic acid. The results were grouped according to the indicated toxicity of the tested compound to the test insect. The chemicals listed in Group I show little or no toxicity, Group II compounds are moderately toxic, and Group III compounds are "decidedly toxic." Methyl isothiocyanate is listed in Group III which includes "the relatively few compounds which have shown a substantial degree of toxicity."

The Frear reference, which is a catalogue of *insecticides* and *fungicides*, lists methyl isothiocyanate as toxic to California red scale.

The secondary references were cited by the examiner presumably as supporting references for the purpose of showing that insecticidal compounds also can be expected to have nematocidal properties. The board's affirmance of the rejection is predicated upon the concept that a compound known to possess properties as an insecticide and a fumigant "would seem to point to the employment of the compound as a soil nematocide." This highly speculative position is in direct opposition to the more recent opinion of the board [3] in Ex parte Hessel, 137 USPQ 384, in which the board [4] stated:

"* * * *We do not consider nematocidal activity to be predictable*

---

2. "* * * It seems necessary to apply to patent litigation from time to time the maxim that one cannot make omelettes of bad eggs—no matter how many are used. One good reference is better than 50 poor ones, and the 50 do not make the one any better. * * *" (Ball & Roller Bearing Co. v. F. C. Sanford Mfg. Co., 2 Cir., 297 F. 163).

3. Opinion dated March 19, 1962; Patent No. 3,086,907 issued April 23, 1963.

4. Two of the same board members participated in the Hessel decision and in the presently appealed decision.

*from insecticidal or fungicidal activity broadly* (Ex parte Santmyer, 132 USPQ 202). While soil or grain fumigants having volatility and stability necessary for such fumigating uses would normally be tested for nematocidal activity, we do not believe that one skilled in this art would employ the relatively nonvolatile pyrrolidone of Frear, or butyrolactone of King, not taught to be purpose of appellant's claim. * * " soil or grain fumigants, for the [Emphasis added.]

Apparently a significant factor which influenced the board in here reaching a conclusion diametrically opposed to the position stated in the Hessel case is found in the following statement:

"* * * The methyl isothiocyanate agent, appellants' specification indicates, is related to the mustard oils known to exhibit nematocidal action and the near homologue of the ethyl isothiocyanate so employed. * * "

As we had occasion to observe in In re Mills, 281 F.2d 218, 47 CCPA 1185:

"* * * Homology provides for the chemist a convenient system of structural classification. Inherent in that system are *differences* as well as similarities in the properties and reactions of the members of any given homologous series.

"A chemist, and it is from the standpoint of a chemist skilled in this art that the question of obviousness must be resolved, would consider the differences as well as the similarities in properties and reactions of the members of any given homologous series. * * * "

Appellants' specification admits that various mustard oils were known to exhibit nematocidal action but that:

"Despite their favorable action against soil nematodes, the various other mustard oils have heretofore found no practical utilization, *since every one of the mustard oils previously proposed for this purpose is extremely toxic to plants.*" [Emphasis added.]

Certain discoveries and observations which underlie appellants' invention are stated in the specification as follows:

"It was now found, in accordance with this invention, that methyl isothiocyanate, which hitherto was not known to be a soil disinfectant, exhibits a far greater activity against soil dwelling nematodes and fungi than any of the mustard oils previously suggested for this purpose. It also far exceeds in effectiveness the conventional commercial preparations used as soil disinfectants, such as the sodium salt of N-methyldithiocarbamic acid, dichlorpropanedichlorpropene mixtures, or ethylene dibromide. *Even more surprising was the discovery that methyl isothiocyanate exhibits a high degree of compatibility with plants. This was especially unpredictable since it was. precisely their excessively strong phytotoxic action which successfully militated against the adoption of the previously studied mustard oils.* The methyl isothiocyanate agent of the present invention also displays excellent long-lasting action, which is far superior to that, for example, of the commercially used sodium N-methyldithiocarbamate." [Emphasis added.]

In considering homologous relationships in relation to the question of obviousness, we think the express language of 35 U.S.C. 103 requires a consideration of the *differences* between the claimed invention and the prior art. Here the examiner and the board considered only the chemical similarities between the claimed compound and the known homologs which comprise the group of mustard oils. The *differences* between the methyl mustard oil here claimed and the prior art compounds *as a soil nematocide* were not discussed in the opinion of the board. It is significant that the claimed methyl mustard oil kills nematodes and *does not kill plants.* The mustard oils which with methyl mustard oil allegedly comprise an homologous series *kill both* nematodes and *plants.*

The mandate of 35 U.S.C. 103 which has been ignored below is that "the differences between the subject matter sought to be patented and the prior art" must be found to be obvious. Neither the examiner nor the board discussed the significant and controlling *difference* in phytotoxic properties between the claimed invention and the prior art. Stated in more technical terms, methyl mustard oil is not phytotoxic. The allegedly homologous members of the mustard oil family are. When used in the soil to control nematodes this difference is critical.

The record here discloses that while the previously tested mustard oils possessed nematocidal activity, *they were extremely toxic to plants.* Certainly the prior art teaching of a soil nematocide which kills *both* nematodes and *plants* is not a teaching which we think would lead one of ordinary skill in controlling soil dwelling nematodes to expect that a chemically related but untried member of a family of chemicals, all of the tested members of which are phytotoxic, would be an effective soil nematocide which was not toxic to plants. The view, stated in Ex parte Hessel, supra, that nematocidal activity is not predictable from insecticidal or fungicidal activity broadly, also seems to us to be applicable here.

While in some cases an homologous relationship between a claimed compound and the prior art compounds could suggest testing the members of the homologous series for a desired effect, we think the record as a whole here *teaches away* from the employment of *any* mustard oil as a *soil* nematocide. The decision of the Board of Appeals rejecting claims 1–9 as obvious over Cupples and Frear in view of the other references is reversed.

In addition to the foregoing rejection, appealed claims 6–8 were also separately rejected by the examiner as "lacking invention over Frear." The board in affirming this rejection stated: " * * * we understand that implicit in the disclosure of the methyl isothiocyanate as a fumigant is the employment of such a compound with the conventional solvents and emulsifying agents of the art." This "understanding" seems to us to but confuse the examiner's position. In summary that position appears to be:

"(1) since Frear shows methyl isothiocyanate to be old, appellant cannot claim a new use for an old compound, and

"(2) while claims 6–8 claim a composition of methyl isothiocyanate in solution in a solvent, solvents are conventionally employed in the compounding of pesticidal compositions."

While we agree with the general proposition stated in (1), claims such as 6–8 to a composition cannot be disposed of on such a summary basis. In many instances very slight physical or chemical changes may be sufficient to avoid such a rejection. For example, very slight changes may be responsible for imparting new properties to the "old compound" and such changes may create a patentable new "composition of matter." It is not sufficient to support such a rejection to rely upon some "rule" which asserts that a known compound "cannot be made patentable merely by adding thereto conventional adjuvents or carriers" as here urged by the solicitor. Each situation must be analyzed in the light of the particular facts disclosed in the record. Cf. Old Town Ribbon & Carbon Co. v. Columbia Ribbon & Carbon Co., 2 Cir., 159 F.2d 379. See also In re Riden et al., 318 F.2d 761, 50 CCPA ——.

There appears to be nothing significant or critical in the particular form in which methyl isothiocyanate is used as a nematocide. Appellants' specification states:

"Methyl isothiocyanate may be applied for the destruction of nematodes and fungi in any suitable form. It can be used either as such or in parasiticidal amounts in solutions of any desired concentration. Although the concentration of the solution may have as its upper limit the solubility of the methyl isothiocyanate in the particular solvent, it may be present in a wide range of concentrations below this limit. Thus fairly dilute solutions may be

employed. The choice of solvents and concentrations is directed toward providing, in the soil to be disinfected, a minimal amount of about 15 to 20 mg. of methyl isothiocyanate per liter of soil.

"A large number of solvents may be used for the preparation of disinfectant solutions of methyl isothiocyanate, for which the only requirement is that they be inert toward this compound. * * *"

As indicated by the above portion of appellants' specification, methyl isothiocyanate can be used as a nematocide as such[5] or in a solvent. The addition of a solvent is not disclosed as affecting the nematocidal properties of the known compound. The addition of solvent is not disclosed as doing anything more than to provide a convenient form for using the methyl isothiocyanate. None of claims 6–8 specify concentrations of the methyl isothiocyanate nor does the specification indicate any critical requirements in this respect. The disclosure requires only that the solvent used be "inert towards this compound." It is therefore our conclusion that the addition of the solvent to the old compound methyl isothiocyanate in the manner disclosed by appellants does not establish a factual basis upon which to find claims 6–8 patentable as a new and unobvious composition of matter. We therefore affirm the separate rejection of claims 6–8.

In thus affirming the rejection of claims 6–8 for the composition of methyl isothiocyanate and a solvent, we do so on a factual basis and for the reason that there is no showing in the record before us that the claimed composition possesses any new properties as a soil nematocide. There is nothing in the record here to indicate that the addition of solvent had any use other than that of a carrier for the methyl isothiocyanate. Cf. In re Jan Rosicky, 276 F.2d 656, 47 CCPA 859.

In summary, we *affirm* the separate rejection of claims 6–8, but reverse the rejection of all claims over the prior art.

Modified.

WORLEY, Chief Judge (dissenting, in which ALMOND, J., joins).

I am unable to agree with the majority that appellants have done any more than would be obvious to one of ordinary skill in the art, thus they are not entitled to a patent.

The Cupples article describes toxicity tests on California red scale made with over 300 chemical compounds in an effort to find *fumigants* better than hydrocyanic acid. The results are grouped according to the compound's indicated toxicity to California red scale. The chemicals listed in Group I show little or no toxicity; Group II compounds are moderately toxic; and Group III compounds are "decidedly toxic." Methyl isothiocyanate is listed in Group III which includes "the relatively few compounds which have shown a substantial degree of toxicity."

The Frear reference, which is a catalogue of *insecticides* and *fungicides*, lists methyl isothiocyanate as toxic to California red scale.

The Stansbury et al. patent relates to a nematocidal composition and to the method of applying it to soil. The patentees state that "It is the opinion of nematologists that a good nematocide should be volatile, slightly soluble in water, and should be able to penetrate nemic membranes."

Eleven secondary references were cited by the examiner for the purpose of showing cumulatively that insecticidal compounds can be expected to have nematocidal properties as well. I agree with that evaluation and note that appellants also agree, at least with respect to two of the cited patents.

Claims 1–9 were rejected as unpatentable over Cupples and Frear in view of

5. The specification states that methyl isothiocyanate "is a solid crystalline substance with a melting point of 35–37°C., and a boiling point of 118–120° C., and hence is not a gaseous material."

Stansbury et al. and the eleven secondary references. In his answer, the examiner states:

"Cupples and Frear unequivocally disclose the use of methyl isothiocyanate as an effective fumigant insecticide. Stansbury teaches that nematocides should have a soil fumigating action. * * * The secondary references (11 references have been cited as typical from a considerably larger number supporting the same view) cumulatively demonstrate that the fumigant insecticides with which they are concerned can be expected to have *both* insecticidal and nematocidal properties. Accordingly, it is the Examiner's contention that nothing more than routine experimentation would be involved in trying the prior art fumigant insecticide as a nematocide. A positive result would not be an unexpected and astonishing finding and does not manifest the unobviousness required for inventive stature. No more than a *looked-for result* is involved, and this, under the patent law, is not an unexpected or unobvious result. * * *"

In affirming, the board noted that appellants' specification acknowledges that various mustard oils, including ethyl isothiocyanate, the adjacent homolog of the compound claimed, was known to exhibit nematocidal action.

The sole issue here is whether the use of methyl isothiocyanate as a nematocide or fungicide is fairly suggested to one of ordinary skill in this field by the teachings of the prior art.

As I understand appellants' contentions, they are that none of the references teaches that methyl isothiocyanate *per se* is a nematocide or fungicide, and that despite the known insecticidal properties of methyl isothiocyanate one skilled in the art would not consider its use as a nematocide to be obvious.

While I agree that none of the references expressly discloses the use of methyl isothiocyanate as a nematocide, *per se,* I think that the prior art would clearly suggest its use for that purpose, primarily because the claimed compound is known as an insecticide; because materials which are known to have insecticidal properties frequently exhibit nematocidal properties as well; and finally because, as the board observed, a variety of mustard oils, including the adjacent homolog to appellants' compound, ethyl isothiocyanate, are admitted by appellants to be nematocides.

It is clear that Cupples shows that methyl isothiocyanate is an effective *fumigant* insecticide. Frear likewise refers to the same compound as an insecticide and fungicide. Stansbury et al. teach that an effective nematocide should volatilize or have a fumigating action on the soil. The eleven secondary references show that fumigant insecticides are likely to exhibit nematocidal properties also. In addition, appellants' specification discloses that various closely related isothiocyanates, including the next adjacent homolog of the claimed compound, are nematocides. Under such circumstances, the prior art would fairly suggest to one of ordinary skill the use of methyl isothiocyanate as a nematocide.

I am not persuaded, as is the majority, that the use of methyl isothiocyanate as a nematocide is *not clearly suggested,* and therefore obvious in view of the art of record, merely because the other mustard oils *may be* toxic to plants. The art recognizes the claimed compound to be a *fumigant insecticide and fungicide;* such materials are frequently used on plants; hence, there appears to be good reason to assume that methyl isothiocyanate is compatible with plant life. Absolute predictability of success is not essential in order that an invention be deemed obvious. In re Moreton, 288 F.2d 940, 48 CCPA 928, 129 USPQ 283.

Furthermore, I see no inconsistency in the board's position in Ex parte Hessel, 137 USPQ 384. The case here is readily distinguishable on its facts from that case. We have more than a bare teaching of insecticidal activity *alone* in the instant case. Here we have a teaching that methyl isothiocyanate is a *fumi-*

*gant* insecticide and that the adjacent homolog will kill nematodes. Neither of these facts is present in Hessel.

There are no grounds here to reverse the decision of the board. I would affirm the rejection of all the claims.