51 CCPA
**Application of Lars RINGDAL.**

**Patent Appeal No. 7002.**

United States Court of Customs and Patent Appeals.

Dec. 12, 1963.

Wenderoth, Lind & Ponack, Washington, D. C. (John E. Lind, Washington, D. C., of counsel), for appellant.

---

Clarence W. Moore, Washington, D. C. (L. F. Parker, Washington, D. C., of counsel), for Comr. of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

The Board of Appeals affirmed the final rejection by the examiner of claims 22, 23 and 26 to 29, inclusive, of appellant's application for Letters Patent, Serial No. 438,169 filed June 21, 1954, for Ammunition. Presumably this rejection was intended to be a rejection for "obviousness" under 35 U.S.C. § 103, and we shall so treat it.

The rejected claims relate to ammunition which may be used in rifles, shotguns, automatic guns, or other types of firearms. Appellant asserts advantages for this ammunition when used either as blank ammunition or as live ammunition. The ammunition comprises a cartridge head of plastic or metal having a pocket to receive a conventional percussion cap assembly. A front piece of tubular form, which is closed or fitted to a projectile at the front end and has an open base which is provided with an inner annular bead, telescopes over and is retained to the head by engagement of the annular bead with a mating annular groove in the head. In the blank ammunition the closed forward end of the front piece (which appellant calls the "meplat") is provided with cross scored lines so that upon firing the "meplat" will open without parts thereof being detached from the front piece and discharged from the gun. When the ammunition is in the form of a shotgun shell, the front piece is closed by a transverse web located inwardly from the front end, and the shot and the charge (which appellant refers to as a "bursting" charge) are carried in the front piece.

While the application discloses various embodiments of the asserted invention, all the appealed claims have in common the requirement that the front piece of the ammunition be formed of polyethylene. Claims 22 and 29 call for the score lines which are provided at the closed end of the front piece in one form of blank ammunition.

The specification discloses various "elastic materials" as being suitable for forming the front piece of the ammunition. These materials include polyethylene, polyvinylchloride, or polyamides. The specification also states:

"* * * Also caoutchouc may be used provided this is prepared in a suitable manner so as to secure the requisite elasticity. Various high styrene-butadiene copolymers containing more than 75% of styrene may be used and also superpolyamides. However, various other plastics may be used providing they have the physical characteristics desired similar to polyethylene."

Polyethylene is disclosed as being a "preferred" material and the specification points out that it begins to soften at about 100°C but has a melting point at which the mass becomes fluid "at about 140–160°."

Appellant's brief stresses the advantages of the claimed ammunition and points out, as does the specification, that:

"There is an important distinction between the cartridge having a brass case and the cartridge of the invention having a plastic case in that upon firing cartridges having brass cases the firing itself will heat such brass case so that a considerable amount of heat will be transmitted to the chamber walls. However, polyethylene and similar plastics have a strong heat insulating power and therefore upon firing, any heat transmission from the cartridge itself to the chamber walls may be disregarded. During tests where a series of bursts are carried out ejected brass cases become so warm that they can not be held by hand while the cases of the above invention are only slightly heated probably not above 40°C. The heating of the chamber will therefore only take place backwardly from the muzzle

of the barrel and it appears that the muzzle in order to affect the chamber walls would have to reach such a temperature as would damage the weapon itself before the conducted heat would affect the cartridge in the chamber.

"Polyethylene also has the property that it does not become viscid. Therefore, should the plastic element become soft, nevertheless the cartridge would not jam and should it even happen that the plastic became fluid in such case it would not damage the barrel. In any case, there is no danger of polyethylene sticking to the chamber walls."

The rejection is stated variously as "no invention," "not inventive" and "unpatentable over" the following references:

| | | |
|---|---|---|
| Perrin et al. | 2,188,465 | Jan. 30, 1940 |
| Behrens (Germany) | 91,591 | Apr. 30, 1897 |
| Laborey (France) | 919,583 | Mar. 12, 1947 |
| Haut-Rhin (France) | 973,692 | Feb. 13, 1951 |
| Société (France) | 999,458 | Jan. 31, 1952 |

The board agreed that the invention claimed by appellant was "unpatentable over" various combinations of the above references. This ground of rejection thus stated is here considered to be a rejection for obviousness under section 103.

The specific language of section 103 requires an analysis of the invention claimed and of the prior art to ascertain the *differences* between them. In re Pieroh & Werres, 319 F.2d 248, 50 CCPA 1471. In the present case the rejection, although it compares the disclosures of the prior art with the invention claimed, does not clearly set forth the differences. Appellant's brief has pointed out these differences which for the purposes of this opinion we summarize as follows:

1. Behrens discloses a blank cartridge of paper.

2. Laborey relates to a shotgun shell wherein the shell is made of cellulose acetate.

3. Haut-Rhin relates to a shotgun shell constructed in two parts which are screwed or glued together.

4. Société relates to hunting ammunition wherein the shell and base plate are constructed from a plastic, a special polyamide.

5. Perrin et al. is directed to a process for rapidly polymerizing ethylene to semi-solid and solid polymers. It contains a disclosure that shotgun shells can be covered with a protective coating of polyethylene.

Having these differences in mind, we are next required under section 103 to determine whether they are of such nature and scope that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in this art. Appealed claims 22 and 23 are illustrative and read as follows:

"22. A blank cartridge comprising a base member having a tubular extension, a percussion cap in the base member, and a front piece member which is closed at its front end and *is integrally moulded from polyethylene*, said members being connected by a tight fit between the same, and said *tubular front piece having at its front end score lines which form a cross at the tip of said end.*

"23. A cartridge comprising a base member having a tubular extension thereon, a percussion cap in said base member, a separate front piece member of *polyethylene,* said members being secured together by *one of said members having a circumfer-*

*ential groove and the other member a correspondingly shaped bead in engagement with said groove."*

We have emphasized in the above claims the significant portions which state the differences which appellant asserts render the claimed subject matter as a whole unobvious under the conditions specified in section 103.

We are of the opinion that the *differences* between the invention *as claimed* in the appealed claims and the prior art do not support appellant's position. The appealed claims do not therefore define a patentable invention.

We think weakening the "meplat" of the ammunition by the use of score lines as claimed in claims 22 and 29 would have been obvious in view of Behrens, despite appellant's argument in his brief that:

"A polyethylene shell has naturally a greater strength than the impregnated paper shell according to Behrens, so that in applicant's construction it is necessary to provide the cross shaped weakening lines for opening in order to securely carry out the *opening* of the blank cartridge point. When the front end of the point of the cartridge tears, naturally pieces thereof will be blown out which is contrary to the action in applicant's construction wherein the cross shaped weakening lines provided an opening and not a single piece of the cartridge is torn away."

It is clear to us that Behrens discloses appellant's general combination of a tubular cartridge case secured to a metal base by a constricted portion which rests in a corresponding groove in the case to secure the head and the front piece. The case has a weakened portion at its tip. Behrens indicates his awareness of the problem of accidents resulting from expelled fragments. Moreover, Behrens states that on ignition of the powder charge contained in his cartridge case, "a small slit is produced by the compressed air in the weakened area (see dotted line, Fig. 1) of the tip, through which gasses and air escape with a loud report." In the light of this disclosure of Behrens we believe that the board correctly expressed the opinion that the weakened portion of Behrens is the "full equivalent" of the score lines set forth in claims 22 and 29 and correctly found nothing unobvious about appellant's score lines in view of the fact that the use of such lines to facilitate tearing is a common expedient and old in many arts.

Rejected claims 23 and 26–29, inclusive, call for a separate front piece member constructed of polyethylene and the securing of such front piece member to a base member by means of a bead and circumferential groove. It seems to us, as it did to the board, that "with the teachings of Societe, Laborey et al. and Haut-Rhin to make the member under question wholly out of a plastic material, it is obvious to one skilled in the art to make the member wholly out of polyethylene, particularly since this material has been suggested to the art, namely by Perrin et al., as a material for use on the same member in question."

The alleged advantages of polyethylene relied upon by appellant to support his position that it is unobvious to use polyethylene are not supported by the record. The record does not establish that a polyethylene shell has greater strength than an impregnated paper shell. Nor has it been shown that the problem of using plastics in the manufacture of shells actually existed in the art a long time without being solved or that it exists when either a superpolyamide (Société) or a cellulose acetate (Haut-Rhin, Laborey) plastic is used. We are unwilling to reverse the Board of Appeals and predicate patentability here on a mere disclosure that one material in a group of disclosed materials is "preferred" without the record also containing further disclosures from which to determine that the use of such a "preferred" material would have been unobvious to a person of ordinary skill in this art. We are unwilling to accept appellant's unsupported arguments relating to the advantages of polyethylene as used in this particular device,

since these arguments are based on the properties of polyethylene which were well known to persons of ordinary skill in this art prior to appellant's invention.

While none of the references except Perrin refers to polyethylene, the references clearly disclose other plastics which correspond to the plastics which appellant discloses as suitable for use in carrying out his invention.[1] Thus, Laborey discloses the advantages of a plastic cartridge case and states:

> "Plastic materials which are almost completely elastic are known. A cartridge case tube made of such materials will not tear when subjected to relatively moderate pressures. It can safely withstand the limited expansion which forces it against the wall of the cartridge chamber and then revert to its exact original diameter. On the other hand, plastic material cannot resist the higher and more disruptive pressure applied to the bottom of the base. The invention therefore provides either an all metal base firmly attached to the tube, or a plastic base integral with said tube and provided with a metal reinforcement."

Appellant criticizes the use of the Laborey reference in part on the basis that "The particular plastic material indicated is cellulose acetate." We do not agree. Laborey's specific statement refers to *"plastic materials derived* from cellulose acetate," as an example. [Emphasis added.] We think a fair reading of the Laborey disclosure as a whole requires us to relate appellant's claimed polyethylene not to cellulose acetate but to "plastic materials which are almost completely elastic." The claimed difference over Laborey then comes down to 1) the use of polyethylene as the plastic and 2) the selection of a specific type of joint between the metal base and plastic front piece. As to the first difference, a person skilled in this art would know, it seems to us, that the selection of a particular plastic for the front piece is to be governed by its physical characteristics and its reaction to the environment in which it is to be used. The selection of polyethylene for use as the front piece in Laborey's cartridge would, it seems to us, have been obvious under all the conditions specified in section 103. As to the second asserted difference, we think Laborey discloses connections between the plastic front piece and the metal bases (see Figs. 3 and 4 of Laborey) from which it would have been similarly obvious to provide the claimed bead and groove attachment called for in claims 23 and 26–29 of appellant's application.

We therefore affirm the decision of the Board of Appeals.

Affirmed.

---

1. See Société French Patent # 999,458 which discloses, inter alia:
> "Finally, the applicant obtained cases which behaved perfectly during firing and had a high resistance to the most varied temperatures, as recorded under different climates, whether hot or cold, by utilizing as plastic materials products of the superpolyamide or superpolyurethane class, or the like, for example, products formed by the condensation into chains of aminoacids, diamines with diacids, diisocyanates with glycols, diurethanes with diamines, etc.
>
> These plasticizable products are sufficiently transparent. They are very easily molded by injection and present the advantage that they practically do not contract during molding.
> "The applicant found that a large variety of these products exist and that those with the greatest flexibility and resiliency must be selected. These products also have the highest degree of resistance. The product designed [sic] in the trade as igamid B is more especially suitable."